Not for Publication

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

HUSSEIN ADEL DAHROUG,

    Plaintiff,

v.

CHICAGO BRIDGE AND IRON COMPANY, *et al.*

    Defendants.

Civil Action No.: 16-8939 (ES) (JSA)

OPINION

**SALAS, DISTRICT JUDGE**

Before the Court is defendants Chicago Bridge and Iron Company and Lummus Technology Inc.'s (together, "CB&I" or "Defendants") motion for summary judgment on Plaintiff Hussein Adel Dahroug's claim for retaliatory discharge under New Jersey's Conscientious Employee Protection Act ("CEPA"), N.J. Stat. Ann. 34:19-1 *et seq.* (D.E. No. 1 ("Complaint" or "Compl.")). (D.E. No. 59). Having reviewed the parties' submissions, the Court decides the motion without oral argument. *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). For the reasons set forth below, the Court GRANTS Defendants' motion.

**I.    BACKGROUND**[1]

CB&I provides the energy industry with engineering, procurement, construction, fabrication, installation, and technology services on a global scale. (SMF ¶ 1). At all relevant times, CBI had three operating groups, including (i) Fabrication Services, (ii) Technology, and

---

[1] The Court refers to the parties' submissions as follows: D.E. No. 59-2 ("Mov. Br."); D.E. No. 60-2 ("Opp. Br."); D.E. No. 61 ("Reply"); D.E. No. 59-1 ("Defs. SMF") and D.E. No. 60 ("Pl. Res. SMF") (together, "SMF"); D.E. No. 60-3 ("Pl. CSMF") and D.E. No. 61-1 ("Defs. Res. CSMF") (together, "CSMF").

1

(iii) Engineering and Construction. (*Id.* ¶ 2).

Plaintiff worked for CB&I since 2007, when it acquired the company that previously employed him. (*Id.* ¶ 4). Plaintiff held the position of Director of Project Controls for a business unit called Lummus Heat Transfer ("LHT"), which operated under CB&I's Fabrication Services group. (*Id.* ¶ 6; CSMF ¶ 3). LHT "designs and engineers specialized heat transfer equipment . . . among other things." (SMF ¶ 6). Plaintiff's responsibilities included "managing, controlling, and reporting on project costs and schedules by collecting performance data (e.g., installed quantities, expended labor hours and other progress measurements) and tracking, analyzing, and reporting data." (*Id.* ¶ 7).

CB&I Thailand Limited ("CB&I Thailand") is a foreign fabrication center that supports CB&I projects (*id.* ¶ 8) by "fabricat[ing] heaters pursuant to intercompany subcontracts from LHT." (Mov. Br. at 2 (citing D.E. No. 59-3, Sangswan Decl. ¶¶ 8–9)).[2] Cost status reports ("CSRs") for CB&I Thailand were available to project managers, project controls, and operations during the relevant period, including Plaintiff. (SMF ¶ 17). CSRs "show various cost categories for a project, and for each of those cost categories, details the original budget, revised budget, actual cost to date, current projection of cost for completion of project, previous projection of cost for completion of project, change from prior report, and over/under revised budget." (*Id.* ¶ 17 n.5).

At the crux of Plaintiff's complaint is his belief that Defendants engaged in wrongdoing because CB&I Thailand's CSRs reflected increased costs for expenditures that drastically exceeded original budgets—by a few million dollars—specifically in categories for other shop expenses, shop overhead, construction overhead, small tools, weld rod, wire, and miscellaneous costs. (Pl. CSMF ¶¶ 8–9 (noting that the CSRs "raised red flags" because the "numbers were 'too

---

[2] The Court cites to Sangswan's declaration for context regarding the relationship between CB&I Thailand and LHT.

high'"); *id.* ¶¶ 15–27). Plaintiff claims that the LHT project that engaged CB&I Thailand for fabrication services cost four times the amount of a virtually identical project that he previously worked on which used a third-party vendor, rather than CB&I Thailand. (*Id.* ¶ 10). Plaintiff theorizes that the contract value between CB&I Thailand and LHT had been increased to offset CB&I's losses. (*Id.* ¶ 41). For example, on September 20, 2016, Plaintiff was allegedly instructed to improve third quarter results for CB&I's Fabrication Services group, specifically through LHT projects, which Plaintiff believed was an improper request to increase LHT profit to offset losses elsewhere. (*Id.* ¶ 46).

There is conflicting testimony from Plaintiff regarding when he retrieved the CSRs for the projects at issue. (*Compare id.* ¶ 7 (stating that Plaintiff reviewed CSRs after a July 20, 2016 meeting "where there was a discussion about losses in CB[&]I Thailand on LHT projects that were being fabricated using CB[&]I Thailand instead of a third-party vendor"), *with* Defs. Res. CSMF ¶ 7 (noting that Plaintiff later testified that he "did not access the CSRs until August 2016 and [that] it took him a 'couple days to look at it and track the numbers'")). The parties also dispute whether and when Plaintiff purportedly engaged in whistleblowing activity with respect to his alleged concerns about CB&I Thailand's CSRs. (Pl. CSMF ¶¶ 6, 11 & 13). Plaintiff maintains that "[a]t the end of July / early August" of 2016 "he notified his superiors about suspicious losses on LHT projects being manufactured by [CB&I's] subsidiary CB[&]I Thailand wherein [Plaintiff] pointed to specific suspicious categories of expenditures that 'raised flags.'" (*Id.* ¶ 6(a)). Plaintiff adds that in August and September of 2016, "he vocally objected to what he believed to be an attempt to shift profits from LHT to CB[&]I Thailand to make CB[&]I Thailand appear profitable, when it obviously wasn't, because he believed that was a misrepresentation to shareholders and improper from a tax perspective." (*Id.* ¶ 6(b)). Lastly, Plaintiff states that in September and

October 2016, "he objected to management's top-down direction to arbitrarily 'borrow tomorrow's profits today' on projects without the project managers' input and without actually reviewing the project's status because he believed that was a misrepresentation to shareholders and a SEC violation." (*Id.* ¶ 6(c)).

On October 12, 2016, Defendants laid Plaintiff off from his employment as the Director of Project Controls for the LHT division of the Fabrication Services group; he received pay until October 26, 2016. (SMF ¶¶ 43 & 45). CB&I claims that it restructured its Fabrication Services group in June and July of the same year, when it combined three business units under the Fabrication Services umbrella, which prompted dozens of employee reductions. (*Id.* ¶ 44). The parties heavily dispute whether Plaintiff's position was eliminated and exactly when Defendants decided to lay him off. (Pl. CSMF ¶¶ 59 & 69).

## II.     LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The mere existence of an alleged disputed fact is not enough. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 247 (1986). Rather, the opposing party must prove that there is a genuine dispute of a material fact. *Id.* at 247–48. An issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. A fact is "material" if under the governing substantive law, a dispute about the fact might affect the outcome of the lawsuit. *Id.* Factual disputes that are irrelevant or unnecessary will not preclude summary judgment. *Id.*

On a summary judgment motion, the moving party must first show that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts

4

to the nonmoving party to present evidence that a genuine issue of material fact compels a trial. *Id.* at 324. To meet its burden, the nonmoving party must offer specific facts that establish a genuine issue of material fact, not just "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). Thus, the nonmoving party cannot rely on unsupported assertions, bare allegations, or speculation to defeat summary judgment. *See Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 252 (3d Cir. 1999). The Court must, however, consider all facts and their reasonable inferences in the light most favorable to the nonmoving party. *See Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995).

**III.   DISCUSSION**

The "CEPA prohibits an 'employer' from 'tak[ing] any retaliatory action against an employee' for informing a supervisor of what the employee reasonably believes to be a violation of law." *Goldrich v. City of Jersey City*, 804 F. App'x 159, 162 (3d Cir. 2020) (quoting N.J. Stat. Ann. § 34:19-3(a)(1)).

Relevant here, the CEPA prohibits employers from taking "any retaliatory action against an employee because the employee does any of the following:"

> a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer, or another employer, with whom there is a business relationship, that the employee reasonably believes:
>
>> (1) is in violation of a law, or a rule or regulation promulgated pursuant to law, including any violation involving deception of, or misrepresentation to, any shareholder, investor, [or] . . . employee . . .; or
>>
>> (2) is fraudulent or criminal, including any activity, policy or practice of deception or misrepresentation which the employee reasonably believes may defraud any shareholder, investor, [or]. . . employee . . . ; . . .

5

> c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:
>
>> (1) is in violation of a law, or a rule or regulation promulgated pursuant to law, including any violation involving deception of, or misrepresentation to, any shareholder, investor, . . . [or] employee, . . . ;
>>
>> (2) is fraudulent or criminal, including any activity, policy or practice of deception or misrepresentation which the employee reasonably believes may defraud any shareholder, investor, . . . employee, . . .; or
>>
>> (3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.

N.J. Stat. Ann. 34:19-3(a) & (c).

To make out a prima facie claim for retaliation under CEPA, a plaintiff must show: (i) he reasonably believed his employer acted in a manner incompatible with a law, rule, regulation, or clear mandate of public policy; (ii) he engaged in whistleblowing activity as described in the CEPA; (iii) an adverse employment action was taken against him; and (iv) a causal connection between the whistleblowing activity and the adverse employment action. *Tinio v. Saint Joseph Reg'l Med. Ctr.*, 645 F. App'x 173, 178 (3d Cir. 2016) (citing *Hitesman v. Bridgeway, Inc.*, 93 A.3d 306, 318 (N.J. 2014)).

Once a plaintiff establishes a prima facie case, the court applies the burden-shifting framework found in federal discrimination cases, as articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Blackburn v. United Parcel Serv., Inc.*, 179 F.3d 81, 92 (3d Cir. 1999). Under this framework, the employer must articulate a legitimate, non-discriminatory reason for its actions. *Id.* Thereafter, the burden shifts back to the plaintiff to show that the legitimate reason is pretextual. *Id.*

6

### A. Whether Plaintiff Reasonably Believed Defendants Acted in a Manner Incompatible with a Law, Rule, Regulation, or Clear Mandate of Public Policy

As it pertains to the first element for CEPA claims brought pursuant to New Jersey Statute Annotated § 34:19-3(a)(1), "either 'the court or the plaintiff' must identify the statute, regulation, rule, or public policy that closely relates to the complained-of conduct." *Chiofalo v. State*, 213 A.3d 900, 908–09 (N.J. 2019) (quoting *Dzwonar v. McDevitt*, 828 A.2d 893, 901 (N.J. 2003)); *Cuff v. Camden City Sch. Dist.*, No. 18-13122, 2019 WL 1950400, at *5 (D.N.J. May 2, 2019), *aff'd*, 790 F. App'x 413 (3d Cir. 2019). A plaintiff "need not show that his or her employer or another employee actually violated the law or a clear mandate of public policy," as "[t]he goal of CEPA . . . is 'not to make lawyers out of conscientious employees.'" *Dzwonar*, 828 A.2d at 901 (quoting *Mehlman v. Mobil Oil Corp.*, 707 A.2d 1000, 1015–16 (N.J. 1998)). Indeed, the New Jersey Supreme Court has stated that it does not "expect whistleblower employees to be lawyers on the spot; once engaged in the legal process, and with the assistance of counsel or careful examination by the court, however, the legal underpinnings for claimed behavior that is perceived as criminal or fraudulent should be able to be teased out sufficiently for identification purposes." *Chiofalo*, 213 A.3d at 910.

As recognized by the Third Circuit, "[t]he plaintiff need not 'set forth facts that, if true, would constitute a violation of [a statute],' . . . but he must establish a 'substantial nexus between the complained-of conduct and a law or public policy identified by the court or the plaintiff[.]'" *Bocobo v. Radiology Consultants of S. Jersey, P.A.*, 477 F. App'x 890, 899 (3d Cir. 2012) (quoting *Dzwonar*, 828 A.2d at 901–03). The New Jersey Supreme Court has cautioned that lower courts "must be alert to the sufficiency of the factual evidence and to whether the acts complained of could support the finding that the complaining employee's belief was a reasonable one, and must take care to ensure that the activity complained about meets this threshold." *Chiofalo*, 213 A.3d

at 910 (internal quotations omitted)); *Battaglia v. United Parcel Serv., Inc.*, 70 A.3d 602, 626 (N.J. 2013). "Those principles demonstrate that it is critical to identify the evidence that an aggrieved employee believes will support the CEPA recovery with care and precision." *Chiofalo*, 213 A.3d at 910 (internal quotations omitted). It follows that "[v]ague and conclusory complaints . . . are not protected under [the] CEPA." *Id.* (internal quotations omitted). Moreover, the "determination whether the plaintiff adequately has established the existence of a clear mandate of public policy is an issue of law." *Mehlman v. Mobil Oil Corp.*, 707 A.2d 1000, 1012 (N.J. 1998) (noting that "[i]ts resolution often will implicate a value judgment that must be made by the court, and not by the jury"); *Blizzard v. Exel Logistics N. Am., Inc.*, No. 02-4722, 2005 WL 3078175, at *7 (D.N.J. Nov. 15, 2005). Thus, "if the required substantial nexus is not shown, the case should not proceed to a jury." *Chiofalo*, 213 A.3d at 909.

In opposing summary judgment, Plaintiff identifies three sources of purported violations of law, rule, or regulation by Defendants, including (i) United States Tax Code, 26 U.S.C. § 482;[3] (ii) the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7241;[4] and (iii) Defendants' Form 10-Q filed with the Securities and Exchange Commission. (Opp. Br. at 5–7 (citing D.E. No. 60-5, Exs. 19–21 to Lentz Cert. at 311–26)).[5] At the root of Plaintiff's case are the CSRs for the Shintech and

---

[3] Section 482 provides, in relevant part: "In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses."

[4] Under the Sarbanes-Oxley Act, corporate officers must "submit sworn certifications that—based on their knowledge—[contain] financial statements [that] do not include material misstatements." *Kanefsky v. Honeywell Int'l Inc.*, No. 18-15536, 2020 WL 2520669, at *5 (D.N.J. May 18, 2020) (citing 15 U.S.C. § 7241). Plaintiff points to Section 302 of the Act entitled "Corporate Responsibility for Financial Reports," which requires certain officers to make annual or quarterly certifications in accordance with six enumerated obligations. (Opp. Br. at 7 & 11–12); 15 U.S.C. § 7241(a)(1)–(6).

[5] All pin citations to Docket Entry Numbers 59-5 and 60-5 (apart from deposition transcripts contained therein) refer to the pagination automatically generated by the Court's CM/ECF system.

Petronas Rapid projects which reflect total costs that he claims were four times the amount of a nearly identical project. (*Id.* at 8–9). He maintains that certain cost codes raised a red flag. (*Id.* at 9; D.E. No. 60-5, Ex. 3 to Lentz Cert. & D.E. No. 59-5, Ex. A to Koshy Cert. (together, "Pl. Dep.") at 110:11–113:6). Plaintiff theorizes that Defendants reallocated LHT profits to an unprofitable foreign subsidiary—CB&I Thailand—to evade tax liability in the United States and to "conceal an unprofitable division's true condition from [his] superiors and the company's shareholders." (Opp. Br. at 10–11 (arguing that Defendants were "'cooking the books' – by fabricating LHT projects in-house by an overseas subsidiary, instead of outsourcing the production as done previously")).

The evidence Plaintiff submits to oppose summary judgment, however, does not support a substantial nexus between the complained-of-conduct and Defendants' alleged violations of law. Plaintiff largely relies on his deposition testimony and increased costs in the CSRs to support the contention that he believed wrongdoing was afoot. (*See, e.g.*, Pl. Dep. at 126:21–25 ("Increasing the moneys - - transferring money from LHT to Thailand to make it look[] profitable, I believe they're reporting a wrong image to shareholders."); *id.* at 141:13–19 ("Projects in LHT US or - - if it made more money. So US tax entitled to have more tax in US, in Europe - - if Thailand made losses, they can claim losses over there in Thailand, correct, but balancing this it may pay nothing but here reduce the tax revenue here and in Europe"); *id.* at 145:5–146:9 (stating that there was a $20 million "[i]ncrease in the contract value . . . between . . . LHT and CBI Thailand"); *id.* at 219:10–17 (stating that if upper management doesn't "know what risk . . . the project [is] facing, what stage this project [is] at of execution, and the details of cost to come, and [they're] putting pressure on people to give [them] money in profit. This action itself [is] considered wrong-

doing."); *id.* at 219:5–7 ("[H]e basically just needed profit, and he doesn't have any information about the project. That is called illegal.").

The Court finds *Patterson v. Glory Foods, Inc.* analogous to the instant case. No. 10-6831, 2012 WL 4504597 (D.N.J. Sept. 28, 2012) (granting summary judgment in defendant-employers' favor on elements one, two, and four of plaintiff's CEPA claim), *aff'd*, 555 F. App'x 207 (3d Cir. 2014). There, Patterson alleged that defendants engaged in an illegal kick-back scheme with Wakefern—an account that Patterson managed—because they failed to seek about $200,000 from Wakefern for food products defendants shipped before Patterson's employment. *Id.* at *1–6.[6] Paterson claimed that he was told by his superiors to let the issue go and was never given an explanation as to why defendants were not seeking (or had stopped seeking) repayment from Wakefern. *Id.* at *6. Although Patterson believed he uncovered an unofficial accrual program between Wakefern and defendants to reimburse them for nonpayment, that program apparently ended for reasons unknown to Patterson. *Id.* Finally, in support of his reasonable belief that wrongdoing was afoot, Patterson claimed that he experienced similar circumstances at a prior employer where an investigation uncovered employee kickbacks and fraud. *Id.*

The district court found that Patterson presented no evidence to support a reasonable belief that an illegal scheme took place in support of his CEPA claim and that his insistence "is merely based upon his own subjective belief regarding how Glory Foods' finances should be managed." *Id.* at *6–7 (citing *Blackburn v. United Parcel Serv., Inc.*, 3 F.Supp.2d 504 (D.N.J. 1998)). The court further found that the payment discrepancy and the termination of the accrual program "resulted from an entirely lawful business decision" and that Patterson's "lack of evidence to the contrary buttresse[d] the [c]ourt's finding that the allegations of wrongdoing on the part of Glory

---

[6] Patterson also maintained that defendants' shareholders were not fully informed about their failure to collect Wakefern's debt. *Patterson*, 555 F. App'x at 211.

10

Foods are insufficient to support [Patterson's] belief that Glory Foods was involved in a 'kick-back' scheme." *Id.* at *7.  On appeal, the Third Circuit affirmed the district court's grant of summary judgment in defendants' favor on the first and second elements of plaintiff's CEPA claim, holding that "Patterson's mere assertions that he believed wrongdoing occurred . . . cannot defeat summary judgment, without some evidence to support them." *Patterson*, 555 F. App'x at 211 (citing *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991)).  The Circuit Court stressed that Patterson cited no evidence to support his theory that a fraud or kickback scheme occurred and rejected Patterson's self-serving deposition testimony that "[f]rom [his] experience as a sales professional any time someone don't try to recover money there's a possibility there is a kickback or some deal going on. . . ." *Id.*

Here, neither Plaintiff's testimony nor the CSRs establish a substantial nexus between Defendants' conduct and a violation of law, rule, or policy, let alone the laws that Plaintiff cites.[7] Although the CSRs reflect that certain cost categories increased over a period of time, the Court cannot engage in the inferential leaps required to reach Plaintiff's theory that those documents are indicative of Defendants' allegedly fraudulent activity or tax evasion.  (*See* D.E. No. 60-5, Exs.

---

[7]  For example, Plaintiff cites 26 U.S.C. § 482, which gives the *Secretary of Treasury* the authority to "distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses." (*See* Opp. Br. at 5 & 7).  Thus, Plaintiff's position as to how the *Defendants* may have violated this provision is unclear.

Similarly, although Plaintiff highlights portions of CB&I's Form 10-Q, he fails to explain how any statements therein violate a law, rule, or public policy based on the financial information contained in the CSRs.  (D.E. No. 60-5, Ex. 19 to Lentz Cert. at 313–14; Opp. Br. at 14); *see Patterson*, 555 F. App'x at 211 (rejecting Patterson's argument that the district court overlooked his contention that fraud was committed on shareholders because he failed to provide evidence "that the shareholders were misled or not informed about the Wakefern debt").  Indeed, the record includes Defendants' public statements that project estimates often vary from actual costs, consistent with the fluctuating costs reflected in the CSRs.  (*See, e.g.*, D.E. No. 60-5, Ex. 19 to Lentz Cert. at 314 ("Due to the various estimates inherent in our contract accounting, actual results could differ from those estimates.")).  Finally, Plaintiff does not explain how Exhibits 20 and 21 pertain to the instant matter.  (*See* D.E. No. 65-5, Exs. 20–21 to Lentz Cert. (attaching two Forbes articles—one dated September 18, 2015, regarding Coca Cola's alleged underreporting of foreign income, and another dated July 29, 2016, regarding Facebook Inc.'s alleged transfer of assets to its Ireland holding company)).

22–23 to Lentz Cert.); *see, e.g.*, *Chiofalo*, 213 A.3d at 910 (acknowledging, in the context of a CEPA claim, "that 'criminal' or 'fraudulent' activity is often apparent and commonly recognizable"); *Patterson*, 555 F. App'x at 211 ("Patterson does not explain the logic by which he inferred that such a basic business activity—Wakefern incurring and repaying a debt, and Glory Foods forgiving some of that debt—was part of some illegal scheme."). For example, there is no logical connection—and Plaintiff makes none—between the CSRs and any of the statements in Defendants' public financial disclosures. Nor is it clear how cost increases in the CSRs lend support to the notion that Defendants either over or under-reported their taxable income. (*See* D.E. No. 60-5, Exs. 22–23 to Lentz Cert.). This uncertainty is buttressed by Plaintiff's own testimony in which he admits that he did not receive cost breakdowns for the projects at issue, notwithstanding his apparent ability to access the relevant data; in other words, the CSRs contain no information on their face that would allow one to determine whether the estimated costs are accurate or appropriate. (Pl. Dep. at 167:11–172:13; 253:21–254:10 & 259:23–260:16; SMF ¶ 18).[8] In addition, Plaintiff's expert did not opine on the issue whether certain cost categories in the CSRs were accurate or appropriate. (D.E. No. 59-5, Ex. G to Koshy Cert. at 248 (noting that "[i]t was not within the scope of [his] analysis to determine the accuracy of [direct] costs . . . . Likewise, it was not within the scope of [his] analysis to determine the accuracy or the validity of the indirect costs")).

Akin to *Patterson*, the mere fact that Defendants' CSRs reflected increased expenditures in certain cost categories does not indicate that they violated or were about to violate a law or

---

[8] Plaintiff pointedly disputes Defendants' contention that he never reviewed the underlying invoices that were available to him and would have helped him determine whether the costs reflected in the CSRs were fraudulent. (Pl. Res. SMF ¶ 18). And these invoices are not part of the record before the Court. Although not dispositive, Defendants' argument regarding Plaintiff's undisputed years of experience is persuasive on this issue. (*See* Reply at 8 (noting the breadth of Plaintiff's experience and arguing that he "knew how to identify unlawful or fraudulent activity, how to confirm suspicions through available documentation, and how and to whom to articulate any concerns he had")).

12

public policy. *See* 555 F. App'x at 211. Because Plaintiff "cannot simply rely on vague, self-serving statements which are unsupported by specific facts in the record to avoid summary judgment," the Court finds that he has failed to establish the first element of his CEPA claim. *See Blizzard*, 2005 WL 3078175, at *8 (citing *Heffron v. Adamar of New Jersey, Inc.*, 270 F. Supp. 2d 562, 574–75 (D.N.J. 2003)). Thus, even if the CSRs contained increased costs that were different than Plaintiff's other projects, "h[is] testimony alone does not sufficiently establish that []he possessed a reasonable belief that [Defendants] actually violated a law, rule, regulation, or clear mandate of public policy sufficient to satisfy the first prong of a prima facie case of a CEPA claim under the language or intent of N.J.S.A. 34:19–3c." *Id.*[9]

Accordingly, because Plaintiff's CEPA claim fails on element one, the Court need not address the parties' arguments on the remaining elements.

## IV. CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is GRANTED. An appropriate Order accompanies this Opinion.

**Dated:** June 21, 2022                                               *s/Esther Salas*
                                                                                    **Esther Salas, U.S.D.J.**

---

[9] Similarly, the cumulative record, including various deposition testimony, does not form a substantial nexus between the complained-of-conduct and Defendants' alleged violations of law. Indeed, the evidence may suggest a reasonable explanation for the cost differentials between Plaintiff's prior projects and the Shintech and Petronas Rapid projects—a business decision to internally source heater fabrication rather than using third-party fabricators, as Defendants had done in the past. (Defs. SMF ¶¶ 12–14 (noting that CB&I "went through a steep learning curve" which "result[ed] in higher short-term execution costs (and therefore costs tha[t] exceeded the initial budget)")); *see Patterson*, 2012 WL 4504597, at *7 ("Plaintiff's belief was unreasonable because the 'discrepancy' and the termination of the [a]ccrual [p]rogram resulted apparently from an entirely lawful business decision.").